UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

JANE DOE, et al., . Civil Action No. 1:05cv701
.
Plaintiffs, .
.
vs. . Alexandria, Virginia
. May 17, 2013
YUSUF ABDI ALI, . 10:10 a.m.
.
Defendant. .
.
. . . . . . . . . . .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS: JOSEPH C. DAVIS, ESQ.
DLA Piper LLP (US)
11911 Freedom Drive, Suite 300
Reston, VA 20190
and
PAUL D. SCHMITT, ESQ.
DLA Piper LLP (US)
500 Eighth Street, N.W.
Washington, D.C. 20004

FOR THE DEFENDANT: JOSEPH P. DRENNAN, ESQ.
218 North Lee Street
Alexandria, VA 22314-5601

ALSO PRESENT: YUSUF ABDI ALI

OFFICIAL COURT REPORTER: ANNELIESE J. THOMSON, RDR, CRR
U.S. District Court, Fifth Floor
401 Courthouse Square
Alexandria, VA 22314
(703)299-8595

(Pages 1 - 19)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

P R O C E E D I N G S

THE CLERK: Civil Action 05-701. Jane Doe, et al., v. Yusuf Abdi Ali. Would counsel please note their appearances for the record.

MR. DAVIS: Good morning, Your Honor. Joe Davis and Paul Schmitt of DLA Piper for plaintiffs, Jane and John Doe.

THE COURT: Good morning.

MR. DRENNAN: Good morning, Your Honor. Joseph Peter Drennan on behalf of the defendant, Yusuf Abdi Ali, who is present before the Court this morning.

THE COURT: All right. Now, as you know, this case has been stayed for a long period of time in part to see how the *Samantar* case went and then also to await the Supreme Court's decision on certain legal issues that related to this case. The Supreme Court has now entered its decision, and we asked you-all to appear for a status conference to determine where this case goes from this point on, and so that's what we're here for.

Remind me -- and, Mr. Drennan, you're the only attorney who's been on this case, I think, since its beginning -- where were you with discovery in this case when it was stayed?

MR. DRENNAN: Your Honor, I would, I would note as an initial matter --

THE COURT: No, just answer my -- where were you on

discovery?

MR. DRENNAN: Where were we on discovery? My client had responded to some written discovery, and my client gave a full deposition, a video deposition. At that time, Cooley Godward was counsel of record. And he gave a full video deposition in Reston, Virginia, back in the spring of 2005.

THE COURT: All right. And had you-all proposed discovery to the plaintiffs? Was there outstanding discovery requests to the plaintiffs?

MR. DRENNAN: I think -- to be honest, Your Honor, I think there was some limited discovery proposed, and we had, we had requested divulgement of the, of the names of the parties plaintiff, whom Your Honor had allowed to proceed anonymously, and those, those names were divulged to us, and we did receive initial discovery from the plaintiffs in the case, including those identities.

However, Your Honor had admonished counsel not to divulge the names of the plaintiffs to my client, and that has really -- at that time had handcuffed us significantly in respect of pursuing full discovery in the case. We don't -- if I can't share with my client information as to who these people are, that poses some significant problems going forward.

THE COURT: Well, in the *Samantar* case, all the witnesses and all the parties' names were fully disclosed. They are on a public record. The case went to trial, as you

know.

Let me hear from plaintiff's counsel. Is there any reason why at this point the identities of the plaintiffs should not be made public?

MR. DAVIS: Your Honor, at this point, I believe that, that the plaintiffs would --

THE COURT: There has to be a reason, a good reason. These are not secret proceedings in federal court.

So there are two questions. One is, is there any reason why their names should not be immediately available to the defendant, and then the second reason -- and again, you know, we have strong case law in the Fourth Circuit, the *Conoco* case, that, you know, we are not a Star Chamber. Everything that goes on in this court is to be open unless there are very, very compelling reasons why they should be sealed. You should know what the compelling reasons are as you stand representing these people.

MR. DAVIS: I understand, Your Honor. Your Honor, I believe the initial reason for requesting that the names of the plaintiffs not be disclosed to the defendant himself was for safety concerns, that both defendants (sic) still remain in Somaliland and are concerned for their own safety given what they allege occurred previously at the hands of Mr. Ali.

I believe that given that Mr. Drennan is aware of the names of the plaintiffs, that should not prevent him from --

should be no impediment to him for beginning the discovery process --

THE COURT: You're not answering my question.

MR. DAVIS: Sorry.

THE COURT: Why are they at this point, in 2013, after we've already had a very public trial with all the names being clearly mentioned, what is the basis for your argument that there is still any real danger or threat to the plaintiffs if their names are known to Mr. Ali?

MR. DAVIS: Your Honor, the plaintiffs live in the northwestern area of what is formerly Somalia, in a region called Somaliland.

THE COURT: None of the plaintiffs are in the United States?

MR. DAVIS: No, ma'am.

THE COURT: Oh, then I think we need to get some motions right away in this case. After the Supreme Court has ruled what it's ruled, we don't even have plaintiffs -- at least in *Samantar*, all but, I think, one of the plaintiffs was in the United States.

MR. DAVIS: Your Honor, are you referring to the *Kiobel* opinion?

THE COURT: Yeah.

MR. DAVIS: Absolutely. And actually, the proposal that we are prepared to make today was in light of the *Kiobel*

decision, was to suggest that Mr. Drennan be given the opportunity -- Mr. Ali, excuse me, be given the opportunity to file a motion to dismiss limited to the issues raised by the Supreme Court in the *Kiobel* decision. Upon the Court's ruling on that motion, then discovery would begin again, and we would go from there.

THE COURT: Well, what if I grant the motion? I assume that it was going to be a motion to dismiss.

MR. DAVIS: I assume, I assume as well, Your Honor. However, there are both Alien Tort Statute claims and Torture Victim Protection Act claims raised by the plaintiffs from the suit. So even if Mr. Ali was successful in moving to dismiss the ATS decisions on the basis of the *Kiobel* decision, the Torture Victim Protection Act claims would continue because *Kiobel* does not touch the Torture Victim Protection Act.

THE COURT: Well, I want to keep the amount of litigation and costs in this case to a minimum, and the first thing, I go back to the first question, is Mr. Ali has lived in this country for how long?

MR. DAVIS: Sixteen years, Your Honor.

THE COURT: What, if any, evidence do you have --

MR. DAVIS: I'm sorry, that might have been incorrect. I'm sorry, Your Honor. I had thought it was 1996.

THE COURT: Mr. Drennan, how long has your client been in the country?

MR. DRENNAN: Well, he's been here continuously since -- no, he's been here continuously since, since '96, but he came here -- he was here at the time the regime fell in 1991, and then he lived in Canada for a while, and Your Honor may recall one of the issues that's before the Court is a statute of limitations defense --

THE COURT: Statute of limitations.

MR. DRENNAN: -- and the plaintiffs had pleaded equitable tolling, and we've already filed with the Court an expert report by a Mr. Chipeur, who's a noted expert on Canadian law in Calgary, who opined that these plaintiffs should have -- could have sued Mr. Ali when he lived openly in Toronto in the early 1990s and did not.

So there's a statute of limitations issue. There's the implications that Your Honor just averted to of the *Kiobel* decision.

Beyond that, Your Honor, I noted that learned counsel made reference to his clients residing in Somaliland, what was formerly known as Somalia. Your Honor, in January of this year, Secretary Clinton in one of the last actions of her tenure as Secretary of State extended recognition to the Federal Republic of Somalia, and shortly thereafter, the prime minister of Somalia issued a diplomatic letter to Secretary of State John Kerry asking the United States to grant immunity to Samantar, and I know this is not the *Samantar* case, but that is

under consideration right now, remains pending.

There's also a petition for certiorari pending before the Supreme Court in the *Samantar* case. The -- when that case last went to conference, the Supreme Court directed the plaintiffs in that case to file a response. The law firm of Akin Gump is still involved in that case. They received an extension. That response is due on the 24th of May.

When the case next goes to conference, because the United States intervened in the *Samantar* case, it's highly likely that the Supreme Court will solicit the opinion of the United States about the pending cert petition in *Samantar*.

And the reason I mention that, Your Honor, I know that these are distinct cases, but there's an interrelationship, and this case is not at issue. And there are immunity defenses that could be raised with regard to defendant Ali as well.

And we certainly concur with the Court's sentiment that the costs of this case be kept to a minimum. You know, my client works as a security guard, Your Honor. My other client was pushed into bankruptcy, and we respectfully submit that depending on what the Supreme Court does in respect of the *Samantar* cert petition, depending upon what the State Department does with respect to the diplomatic letter requesting immunity for Samantar, that could have profound implications for my client here before this Court today,

Mr. Ali, as well, and this case may be mooted. The government could very well come in and elect to grant, to grant immunity to Mr. Ali as well.

And so for all of these reasons, we would respectfully request that the prudent thing to do would be to put the matter over for 90 days. By that time, it would be -- continue the stay for 90 days, and by that time, it would become apparent as to where the cert petition is headed in respect of the *Samantar* matter as well as what action the State Department will take with regard to the formal request for immunity.

We -- when we learned of the status hearing, one of the first things that has come to mind is to make a request of the Federal Republic of Somalia, which is recognized by the United States as being the sole government of Somalia, that immunity be, be given to Ali as well.

And so, Your Honor, for those reasons, we would -- and the State Department will act, in all likelihood, they must act on the request from a sovereign state for immunity for a former prime minister with regard to Samantar, and we would respectfully request the matter be put over for 90 days because how that all plays out will be apparent by then, and we will not be in the point of having a man who works as a security guard, who's got a wife who's present in the courtroom and four children, that he's going to be in a point where he can't pay

his lawyers and he won't have counsel, and then what purpose would that serve?

And unfortunately, Your Honor, that's sort of what happened with regard to the *Samantar* matter.

THE COURT: All right.

MR. DRENNAN: And we would respectfully ask that the matter be stayed for, not for an indefinite period of time but for 90 days, because within that ambit of time, the cert petition will in all likelihood have been ruled on and as with regard to the request for immunity for Samantar, and then we'll follow that with a request with regard to Mr. Ali --

THE COURT: Well, you know, one of the things that delayed the *Samantar* case for almost two years was we were waiting for the State Department to express its position one way or the other in that litigation. I don't think we ever did that in this case, or did we?

MR. DRENNAN: We actually did, Your Honor.

THE COURT: We did that in --

MR. DRENNAN: It was in a somewhat different context because in this case, back in 2005, as the Court would recall, the plaintiffs couldn't get here to testify. I had noted their depositions when the case was initially filed in 2004, and the case was essentially non-suited in early 2005. The judge -- Your Honor dismissed the case, giving the defendants leave to -- or plaintiffs, rather, leave to refile and to formulate

some discovery plan that would allow these plaintiffs to, to testify in that part of the world.

Initially, they wanted to testify in Hargeisa, and at that time, there was no government recognized there. I objected. Your Honor actually acceded to that position. Plaintiffs then proposed depositions in Ethiopia, and we objected to that as well for somewhat different reasons, because of impending elections in Ethiopia, because of the impact of the Somali political situation in Ethiopia.

And there was violence in Ethiopia. In May of 2005, 150 people were massacred after the presidential election there, and shortly thereafter, Your Honor stayed the case -- this case pending a -- the procurement by either party of a declaration of interest from the State Department that this case would not be injurious to U.S. foreign policy essentially, and, and it was on that premise that the case was stayed for, for years.

And then in the *Samantar* case, as Your Honor will recall, on Valentine's Day 2011, after the case had been remanded from the Supreme Court the first time, the State Department did file a statement of interest, indicating that the case should go forward, and notwithstanding a request from the then transitional government for immunity, the premise being cited by the, by the Justice Department and the State Department in that statement of interest being that

Mr. Samantar has resided in the United States for a long time and the second being that there's no recognized government of Somalia.

Well, that's all changed now as of January of this year, and respectfully, Your Honor, we think that the State Department may very well have an interest in what's going on in respect of this litigation and as to whether it's appropriate for this litigation to go forward.

THE COURT: Then why, why would it not be appropriate for the Court to once again send that communication, which we did in the other case --

MR. DRENNAN: Yes.

THE COURT: -- to the State Department, asking -- giving them sort of one last opportunity to weigh in on this case so that we don't waste time in this respect?

MR. DRENNAN: That's essentially what we would be asking for, Your Honor, and we would think that that would be the appropriate thing to do under the existing circumstances and would not be prejudicial to the plaintiffs, because the case having been in the court system for eight-and-a-half years essentially, with the first case having been dismissed because the plaintiffs couldn't come here, that an additional 90 days or thereabouts would not be prejudicial to the plaintiffs and may provide some clarity to the situation and may moot this case.

THE COURT: All right.

MR. DAVIS: Your Honor, if I may? We've spoken to -- let me say first you're looking at and one other attorney is going to be the trial team in this case. There aren't going to be any other DLA Piper attorneys appearing before you, so any suggestion that we have any intention of litigating Mr. Ali into bankruptcy is not what we intend to do. We are just as interested in an efficient operation in this case as he is.

With regard to the stay, my colleague and I had spoken to Mr. Drennan last week, and he proposed it. At the time, we believed -- and I believe this is just miscommunication -- that the stay he was requesting would have been indefinite, waiting until the State Department weighed in.

MR. DRENNAN: No.

MR. DAVIS: Apparently, that is -- I've now learned today that's not the case.

What the plaintiffs are concerned about is the same thing as what has happened previously in this case. This case was stayed for six years, waiting for the State Department to weigh in. If Mr. Drennan would like 90 days to have the opportunity to see if he can get the State Department or the U.S. government to weigh in one way or the other, we're prepared to agree to that, but we don't want it to be indefinite.

THE COURT: All right, I agree with you. One way or

the other, the case has to be resolved, but it would also be, frankly, a travesty for your clients to go through the procedure, go maybe through the trial, have to have their names disclosed, have to testify to what's happened, and then to have it all set aside because the executive branch steps in and says there is a significant international relations diplomacy problem here with a new young republic, we're trying to have, you know, reconciliation, as sometimes happens in these countries that have been torn apart, and this kind of litigation is detrimental and we want you to stop it. It does them no good if they've gone through the process and that's the outcome.

So here's what I'm going to suggest: I am going to stay the case. I'm going to ask the two of you, two teams, to see if you can agree to draft a communication to the State Department. I forget whether, I think it was -- I don't recall, I'll have to go through the file, did I send an order or a letter? I did something, I know.

But draft one. See if you can agree to that so that we can get the State Department to express their view one way or the other as to whether this case should, you know, go forward.

MR. DAVIS: I agree, Your Honor. And we're happy to work with Mr. Drennan on drafting that together.

THE COURT: All right.

MR. DAVIS: I believe what -- in reading the previous counsel's motion to lift the stay from 2011, one of the issues was that the State Department at that point was not aware whether the Court had officially requested a statement of interest. So I would hope that --

THE COURT: It's going to come from me.

MR. DAVIS: I understand.

THE COURT: I'm going to sign whatever we do.

MR. DAVIS: That's what I wanted to confirm.

THE COURT: Absolutely. And I just -- oh, I'll have my clerks check as well. I think it may have been a letter. I don't think I ordered the State Department.

It was a letter, Mr. Drennan? You should remember what I did.

MR. DRENNAN: Your Honor --

THE COURT: Because I --

MR. DRENNAN: -- no, there was not a formal order directed to the, to the State Department.

The stay basically was conditioned upon either party procuring from the State Department a statement of interest that the case going forward would not be contrary to American foreign policy interest, something to that effect. That's what it was.

THE COURT: All right. Then put your very wise heads together; see what you come up with. I have no problem on my

letterhead issuing a letter to the State Department, to Secretary Kerry or whoever is the appropriate person, requesting, you know, their input on this.

It is a sensitive issue. With a new republic that's starting and the hope that it can blossom and that some of these horrible things can stop over there, I would not want, you know, anything going on in the court to interfere with that, and ultimately, since your clients still live there, it's in their best interests to have, you know, peace and security, and if they're still worried about their security even with the new political regime, I mean, that's a factor to be taken into consideration.

So at, at this point, I'm going to grant a stay, and I'm going to say 90 days. It may take a bit more time, but as quickly as you can, get a draft of something to me. Hopefully, you can agree. I mean, if you disagree, then send me two drafts, and I'll look and see which I like better or merge the two myself, all right?

And as soon as you do that, then we will issue it to the State Department, and I think knowing how State works, you probably need to give them probably 30 to 60 days to respond, something appropriate and respectful. So maybe I should change my mind: 120-day stay from this case, all right?

And obviously, keep me posted. If there are any major issues or events that occur within that 120-day period,

keep us posted, all right?

MR. DAVIS: We will, Your Honor. Thank you.

THE COURT: All right.

MR. DRENNAN: Thank you, Your Honor. And one last thing.

THE COURT: Yeah.

MR. DRENNAN: Would the Court be inclined to rule today on the -- on modifying the protective order that basically precludes me from sharing the names of the plaintiffs with my client?

THE COURT: Is Mr. Ali a U.S. citizen at this point?

MR. DRENNAN: No, he is not. He's an LPR, a legal permanent resident.

THE COURT: All right. The employment he has is full time?

MR. DRENNAN: Yes.

MR. ALI: Yes.

THE COURT: Is it with a government agency or a private company?

MR. DRENNAN: He works at the airport for a private contractor.

THE COURT: All right. There's no evidence of any misconduct by the defendant while he's been in this country?

MR. DRENNAN: No. I don't believe he's even so much as gotten a parking ticket in the United States, Your Honor.

THE COURT: Is there any -- does the plaintiffs' counsel, do you have any evidence or reason to believe that if Mr. Ali has the names of these people, there's any likelihood that he's going to -- and he's given an order by the Court that he can't divulge those names to anyone, the only person he could discuss the names with would be Mr. Drennan, that he would not follow that direction?

MR. DAVIS: With that limitation, I have no reason to believe that he wouldn't follow that direction, but what I'd request, Your Honor, is if we're waiting 120 days for the State Department to weigh in anyway or the State Department may come in in 120 days and recommend the case be dismissed, and given that there won't be any discovery taken during that time, it's an early issue to discuss that now, and we'd propose putting it off until the end of the stay.

THE COURT: I will for just another 120 days isn't going to kill anybody, but you need to spend some time then with your clients --

MR. DAVIS: I understand.

THE COURT: -- and make sure they understand that, I mean, you're going to have to have hard evidence, not just surmising, to suggest any basis for continuing the anonymity of the plaintiffs.

MR. DAVIS: We understand, Your Honor, and we will be prepared at the next status conference 120 days from now to

deal with that issue again.

THE COURT: All right. Well, let's just officially put this back on the book then. We're looking at September, right, for 120 days? Sometime in September?

Let's tentatively put this on for a status conference on Friday, September 20. Does that work for everybody?

MR. DAVIS: That's fine, Your Honor.

THE COURT: All right, that will be at 10:00.

MR. DRENNAN: That's agreeable to the defendant. Be at 10 a.m., Your Honor?

THE COURT: 10 a.m., um-hum.

All right, very good. Then you're all free to go.

MR. DAVIS: Thank you.

MR. SCHMITT: Thank you, Your Honor.

(Which were all the proceedings had at this time.)

CERTIFICATE OF THE REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

/s/
Anneliese J. Thomson