IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FARHAN MOHAMOUD TANI WARFAA,    )
                                )
          Plaintiff,            )
                                )
     v.                         )      1:05cv701 (LMB/JFA)
                                )
YUSUF ABDI ALI,                 )
                                )
          Defendant.            )

## MEMORANDUM OPINION

Before the Court is defendant's Renewed Motion to Dismiss. For the reasons that follow, in addition to the reasons stated in open court, defendant's motion will be granted in part and denied in part.

### I.  BACKGROUND

This civil action arises out of events that occurred in Somalia during the tumultuous regime of Mohamed Siad Barre. Plaintiff Farhan Mohamoud Tani Warfaa ("plaintiff" or "Warfaa") is a Somali national who was allegedly tortured based on his membership in a clan opposed to Barre's regime.  Defendant Yusuf Abdi Ali ("defendant" or "Ali") is a former officer of the Somali National Army, now living in the United States, who allegedly directed and participated in plaintiff's torture.

The facts alleged in the Amended Complaint are as follows. In 1987, plaintiff was a farmer living in northern Somalia.  Am. Compl. ¶ 17.  At that time, defendant was a Colonel in the

Somali National Army, serving in the Fifth Battalion, which operated out of the nearby city of Gebiley, Somalia.  Id. ¶¶ 6, 15.  In December 1987, pursuant to defendant's orders, Fifth Battalion soldiers abducted plaintiff from his home at gunpoint and took him to the Army's regional headquarters.  Id. ¶¶ 17-18. Over the course of the next three months, plaintiff's arms and legs were bound, he was stripped naked, and he was beaten to the point of unconsciousness at least nine times.  Id. ¶¶ 20-24. Defendant was present and witnessed at least some of plaintiff's torture.  Id. ¶ 25.  In March 1988, defendant personally interrogated plaintiff, at the end of which defendant took out a pistol and shot plaintiff five times.  Id. ¶ 26.  Assuming plaintiff was dead, defendant ordered his subordinates to bury the body.  Id.  The soldiers quickly discovered that plaintiff was not dead, however, and they agreed to release him in exchange for a significant bribe.  Id. ¶ 27.

In 1990, anticipating the overthrow of Barre's regime, defendant entered Canada through the United States.  Id. at ¶ 7. In 1992, Canada deported defendant back to the United States for gross human rights abuses in Somalia.  Id. ¶ 8.  In 1994, the United States similarly threatened defendant with deportation, and he voluntarily departed for Somalia in July 1994.  Id. Defendant nonetheless returned to the United States in December

1996 and has been living here ever since as a lawful resident alien.  See id.

On November 10, 2004, two plaintiffs, proceeding anonymously as Jane and John Doe, filed suit against defendant in federal court.  Pursuant to an Order of the Court, issued on April 29, 2005, their complaint was voluntarily dismissed.  On June 13, 2005, the same plaintiffs initiated the instant action. The Complaint alleged that defendant is liable for engaging in attempted extrajudicial killing, torture, degrading treatment, arbitrary detention, crimes against humanity, and war crimes, in violation of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victim Protection Act of 1991 ("TVPA"), 106 Stat. 73, 28 U.S.C. § 1350 note.

This action has been subject to a number of stays, mostly to give the United States Department of State an opportunity to express its views on defendant's claim of immunity and to give the Supreme Court an opportunity to decide related issues in a companion case, Samantar v. Yousuf, 560 U.S. 305 (2010).  The final stay was lifted on April 25, 2014, one day after the Court received a Statement of Interest Submitted by the United States of America, explaining that the "United States is not in a position to present views to the Court concerning this matter at this time."  On May 9, 2014, plaintiff Farhan Mohamoud Tani

Warfaa filed an Amended Complaint using his true name and restating his claims against defendant; the other plaintiff, Jane Doe, elected not to proceed with this action, which has been recaptioned to reflect these changes.

## II.   DISCUSSION

Defendant moves to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

### A. Standard of Review

Under Rule 12(b)(1), a court must dismiss an action if it finds subject-matter jurisdiction lacking.  Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006).  The burden rests with the plaintiff to establish that such jurisdiction exists.  Warren v. Sessoms & Rogers, P.A., 676 F.3d 365, 370-71 (4th Cir. 2012). Under Rule 12(b)(6), a court must begin by assuming that the facts alleged in the complaint are true and by drawing all reasonable inferences in the plaintiff's favor.  Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002).  "Judgment should be entered when the pleadings, construing the facts in the light most favorable to the non-moving party, fail to state any cognizable claim for relief." O'Ryan v. Dehler Mfg. Co., 99 F. Supp. 2d 714, 718 (E.D. Va. 2000).  In other words, to avoid dismissal, the factual

4

allegations in the complaint, taken as true, "must be enough to raise a right of relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  That means a plaintiff must "nudge[] [his] claims across the line from conceivable to plausible." Id. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### B. Alien Tort Statute Claims

Although defendant failed to raise the issue in his papers, the Court must address the effect of Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013), on plaintiff's ATS claims.[1]  The ATS provides "original jurisdiction" in the federal

---

[1] On July 22, 2014, three days before oral argument on defendant's motion, the Court issued an Order instructing plaintiff to present "at the scheduled hearing any argument that his ATS claims are not barred" by Kiobel.  On July 23, 2014, plaintiff submitted, without comment, a Notice of Supplemental Authority, which simply directed the Court's attention to Al Shimari v. CACI Premier Tech., Inc., No. 13-1937, 2014 WL 2922840 (4th Cir. June 30, 2014).  In Al Shimari, the Fourth Circuit declined to dismiss ATS claims brought by foreign nationals against an American corporation for torture and mistreatment at the Abu Ghraib prison in Iraq.  Id. at *1.  The foreign nationals alleged that their torture and mistreatment came at the hands of United States citizens employed pursuant to a contract with the United States government at a facility administered by the United States military.  Id. at *9-*12. Plaintiff fails to address any of the obvious factual dissimilarities with his case, most notably that Al Shimari involved conduct allegedly sanctioned on American soil by the

district courts over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The Supreme Court has clarified that the ATS is a jurisdictional grant for only a limited category of claims premised on violations of internationally accepted norms. Sosa v. Alvarez-Machain, 542 U.S. 692, 729 (2004). In Kiobel, the Supreme Court further clarified that such claims, generally speaking, must be based on violations occurring on American soil. 133 S. Ct. at 1669 (concluding that "relief [under the ATS] for violations of the law of nations occurring outside the United States is barred" (citing Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247 (2010))). In other words, the Supreme Court held that a cognizable ATS claim may not "reach conduct occurring in the territory of a foreign sovereign." Id. at 1664.

Here, "[a]ll the relevant conduct" alleged in the Amended Complaint occurred in Somalia, id. at 1669, carried out by a defendant who at the time was not a citizen or resident of the United States. Plaintiff has alleged no facts showing that defendant's violations of international law otherwise "touch[ed] and concern[ed] the territory of the United States." Id.

---

federal government and a domestic corporation. Plaintiff does not come close to alleging a similarly contemporaneous connection between the United States and defendant's conduct.

Because the extraterritoriality analysis set forth in <u>Kiobel</u>
appears to turn on the location of the relevant conduct, not the
present location of the defendant, a straightforward application
to the instant action leads the Court to conclude that
plaintiff's ATS claims are "barred" and must be dismissed.

        **C.** <u>**Torture Victim Protection Act Claims**</u>

    Plaintiff's TVPA claims are not subject to the same
analysis.  Unlike with the ATS, there are strong indications
that the TVPA was intended to have extraterritorial application.
The language of the TVPA, which creates civil liability for
extrajudicial killing and torture carried out by an individual
with "actual or apparent authority, or color of law, of any
foreign nation," naturally contemplates conduct occurring in the
territory of a foreign sovereign.  28 U.S.C. § 1350 note.
Moreover, the Supreme Court did not purport to curb the
extraterritorial reach of the TVPA in <u>Kiobel</u>.  <u>See</u> 133 S. Ct. at
1669 (noting that the TVPA addresses "human rights abuses
committed abroad" (Kennedy, J., concurring)); <u>see also</u> <u>Chowdhury</u>
<u>v. Worldtel Bangladesh Holding, Ltd.</u>, 746 F.3d 42, 51 (2d Cir.
2014) (concluding that there was "no bar on the basis of
extraterritoriality to [the plaintiff's] TVPA claim").
Accordingly, the Court will consider defendant's many defenses
to plaintiff's TVPA claims.

### 1. Threshold Issues

Defendant challenges plaintiff's ability to have these claims adjudicated in federal court on the grounds that they implicate nonjusticiable political questions and acts of state, and that plaintiff is immune from suit in any event.  Br. in Supp. of Def.'s Renewed Mot. to Dismiss ("Def.'s Br."), at 6-14. Although defendant purports to raise these arguments under Rule 12(b)(1), none of the three doctrines on which he relies are strictly jurisdictional.

### a. Political Question Doctrine

Federal courts have long been reluctant to decide issues that might infringe upon the province of the Executive Branch. It was Chief Justice Marshall who first remarked that "questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made" in federal courts.  Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 170 (1803).  This is the essence of the political question doctrine.  The Supreme Court elaborated on the doctrine in Baker v. Carr, 369 U.S. 186 (1962), describing it as a function of the separation of powers and setting forth six factors for lower courts to consider, the presence of any one of which requires dismissal if the factor is "inextricable from the

case at bar." Id. at 217. According to defendant, two of the Baker factors are especially relevant here:

> [4] "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"; [and]

> [6] "the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

Id.

It is true that the Supreme Court has singled out the foreign affairs context as one to which the political question doctrine will normally apply: "[n]ot only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views." Id. at 211. Even so, it remains possible for an action to touch on foreign affairs without necessarily raising a nonjusticiable political question. See El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836, 841 (D.C. Cir. 2010) ("[T]he political question doctrine does not bar a claim that the government has violated the Constitution simply because the claim implicates foreign relations."). Accordingly, courts are directed to undertake "a discriminating analysis of the particular question posed" in view of the unique circumstances

of the case to determine whether the political question doctrine prevents a plaintiff's claims from going forward.  <u>Baker</u>, 369 U.S. at 211.

Here, such analysis weighs against applying the political question doctrine to plaintiff's TVPA claims.  First, there is no danger that this Court will express a lack of respect for the Executive Branch by adjudicating plaintiff's claims because foreign affairs, as such, are not directly implicated.  <u>See id.</u> In other words, the Court need not reconsider the wisdom of discretionary decisions made by the Executive Branch (or the Legislative Branch, for that matter) regarding our nation's relationship with the government of Somalia.  Nor would resolution in any way call into question the prudence of the Executive Branch in a matter of foreign affairs constitutionally committed to its discretion.  To the contrary, defendant cannot identify a single decision of the Executive Branch that might justify application of the political question doctrine because no such decision has in fact been made, setting this case apart from those cited in defendant's papers, all of which involved some affirmative policy decision made by a political branch. <u>See, e.g.</u>, <u>Corrie v. Caterpillar, Inc.</u>, 503 F.3d 974, 982 (9th Cir. 2007) (noting that the "decisive factor" favoring application of political question doctrine was that the weapon

10

"sales [at issue] to Israel were paid for by the United

States"); Doe v. Exxon Mobil Corp., 393 F. Supp. 2d 20, 22

(D.D.C. 2005) (holding that "adjudication of this lawsuit at

this time would in fact risk a potentially serious adverse

impact on significant interests of the United States" after the

State Department advised the court that the lawsuit should not

proceed).  Plaintiff's claims present purely legal issues, and

therefore do not implicate any decisions made by coordinate

branches.  Moreover, it is well established that the resolution

of claims brought under the TVPA has been constitutionally

committed to the Judiciary.  See Kadic v. Karadzic, 70 F.3d 232,

249 (2d Cir. 1995).

     Second, there is only a slight risk of embarrassment from

multifarious pronouncements by different branches on the subject

of the instant litigation.  See Baker, 369 U.S. at 211.  This

factor is decisive in cases where "judicial resolution of a

question would contradict prior decisions taken by a political

branch in those limited contexts where such contradiction would

seriously interfere with important governmental interests."

Kadic, 70 F.3d at 249; see also Sosa, 542 U.S. at 733 n.21

(explaining that "federal courts should give serious weight to

the Executive Branch's view of the case's impact on foreign

policy").  But, again, no contradictory decisions have been made

here.  The Court has afforded the Executive Branch three
opportunities to "express its views on defendant's claim of
immunity"; each time the Executive Branch has declined.[2]  The
Executive Branch has similarly declined to inform the Court of
any potential adverse impact on foreign affairs in light of the
uncertain political and security situation in Somalia.[3]  Allowing
plaintiff's claims to go forward in no way contradicts a clear
statement of interest from the Executive Branch, much less poses
the threat of seriously interfering in the conduct of foreign
affairs.  Accordingly, there is no definite basis at present to
believe that adjudicating the claims before the Court might
infringe on the province of a coordinate branch.  See Baker, 369
U.S. at 211 (explaining that "it is error to suppose that every
case or controversy which touches foreign relations lies beyond
judicial cognizance").

Defendant's position — that the political uncertainty
itself and the potential for an immunity request from the newly

---

[2] Defendant suggests that the Executive Branch may request
immunity pending the outcome of negotiations with the
transitional government of Somalia.  Rather than deal in
speculation, the Court can always revisit the issue if and when
such a request is made.

[3] It is worth noting that the United States does not currently
have an ambassador to or embassy in Somalia; our nation's
interests are represented instead by a Special Representative
for Somalia based in the United States Embassy in Nairobi,
Kenya.

12

formed Somali government justifies application of the doctrine —
conflates political questions with political cases.  See Japan
Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986)
(cautioning that a political question does not arise "merely
because [a] decision may have significant political overtones").
Because there is no authority for the proposition that mere
political uncertainty, unaccompanied by a statement of interest
from a coordinate branch, renders a case nonjusticiable, the
political question doctrine does not apply here.

### b. Act of State Doctrine

The "act of state" doctrine prevents federal courts "from
inquiring into the validity of the public acts a recognized
foreign sovereign power committed within its own territory."
Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401 (1964).
Like the political question doctrine, the act of state doctrine
is derived in part from the concern that the Judiciary, by
questioning the validity of such acts, could interfere with the
Executive Branch's conduct of foreign affairs.  W.S. Kirkpatrick
& Co. v. Environmental Tectonics Corp., 493 U.S. 400, 404
(1990).  Accordingly, a plaintiff's claim may be barred to the
extent that it challenges (1) an "official act of a foreign
sovereign performed within its own territory"; and (2) "the
relief sought or the defense interposed [would require] a court

13

in the United States to declare invalid the [foreign sovereign's] official act." Id. at 405.

Here, application of the act of state doctrine fails at the first step. To understand why, it is necessary to understand the concept of jus cogens norms of international law, which are certain "universally agreed-upon norms" "accepted and recognized by the international community of States as a whole." Yousuf v. Samantar, 699 F.3d 763, 774 (4th Cir. 2012), cert. denied, 134 S. Ct. 897 (2014) (internal quotation marks and citations omitted). As a result, acts that violate jus cogens norms are not officially authorized by any foreign sovereigns. See Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 718 (9th Cir. 1992) ("International law does not recognize an act that violates jus cogens as a sovereign act[.]"). It follows that an act that violates jus cogens norms cannot serve as a basis for the act of state doctrine.

Because plaintiff's TVPA claims are premised on alleged acts that violate jus cogens norms, the act of state doctrine is inapplicable. Extrajudicial killing has long been condemned by international law. See Doe I v. UNOCAL Corp., 395 F.3d 932, 959 (9th Cir. 2002); see also Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 345 (S.D.N.Y. 2003). The Amended Complaint alleges that defendant attempted to kill

14

plaintiff by "[taking] out his pistol and fir[ing] five shots,"
several of which hit plaintiff, at the conclusion of an
interrogation session.  Am. Compl. ¶ 26.  These allegations,
which must be accepted as true at this stage in the litigation,
constitute jus cogens violations and therefore are not
recognized as official sovereign acts.  Likewise, the right to
be free from torture "is fundamental and universal, a right
deserving of the highest status under international law, a norm
of jus cogens."  Siderman de Blake, 965 F.2d at 717 (surveying
case law, statutes, and scholarly literature).  The Amended
Complaint alleges that defendant and subordinate members of the
Somali National Army at various points bound plaintiff's arms
and legs, stripped him naked, and beat him until he lost
consciousness.  Am. Compl. ¶¶ 21-22; see also The Convention
Against Torture and Other Cruel, Inhuman or Degrading Treatment
or Punishment, Dec. 10, 1984, 23 I.L.M. 1027, 1465 U.N.T.S. 85
(defining torture for purposes of international law).  Again,
such allegations amount to jus cogens violations which would not
constitute sovereign acts.

     Even if defendant could make the required two-part showing,
the Court would still have discretion not to apply the act of
state doctrine where the underlying policies weigh against its

application.  The Supreme Court articulated three such policies

in Sabbatino:

> [1]  [T]he  greater  the  degree  of  codification  or
> consensus  concerning  a  particular  area  of
> international  law,  the  more  appropriate  it  is  for  the
> judiciary  to  render  decisions  regarding  it . . . .
> [2][T]he  less  important  the  implications  of  an  issue
> are  for  our  foreign  relations,  the  weaker  the
> justification  for  exclusivity  in  the  political
> branches.  [3]  The  balance  of  relevant  considerations
> may  also  be  shifted  if  the  government  which
> perpetrated  the  challenged  act  of  state  is  no  longer
> in  existence.

Id. at 428.  None of these policies would be served by applying

the act of state doctrine to plaintiff's TVPA claims.  First,

the consensus against extrajudicial killing and torture is

foundational in international law.  Second, for reasons

discussed above, plaintiff's claims do not implicate any

important issues of foreign affairs.  Third, Barre's regime was

toppled long ago, meaning the present suit is less likely to

give rise to any new hostilities or political tensions.  It is

therefore clear that application of the act of state doctrine is

not appropriate.

### c. Official Acts Immunity

Defendant also invokes "official acts" immunity to the

extent plaintiff seeks to hold him liable for acts committed

pursuant to his official duties as a Colonel in the Somali

National Army.  See Restatement (Second) of Foreign Relations

16

Law § 66(f) (stating that "[t]he immunity of a foreign state
. . . extends to . . . any . . . public minister, official, or
agent of the state with respect to acts performed in his
official capacity if the effect of exercising jurisdiction would
be to enforce a rule of law against the state"); see also Matar
v. Dichter, 563 F.3d 9, 14 (2d Cir. 2009) ("At the time the FSIA
was enacted, the common law of foreign sovereign immunity
recognized an individual official's entitlement to immunity for
acts performed in his official capacity." (internal quotation
marks omitted)).  Official acts immunity is conduct-based and is
generally available to both current and former foreign
officials.  See Matar, 563 F.3d at 14 ("An immunity based on
acts — rather than status — does not depend on tenure in
office.").

Any claim defendant had to official acts immunity was
squarely foreclosed by the Fourth Circuit's decision in Yousuf
v. Samantar, 699 F.3d 763, 774 (4th Cir. 2012), cert. denied,
134 S. Ct. 897 (2014).  In Samantar, the Fourth Circuit
delineated an important limit on official acts immunity: "a
foreign official may assert immunity for official acts performed
within the scope of his duty, but not for private acts where the
officer purports to act as an individual and not as an official,
such that a suit directed against that action is not a suit

17

against the sovereign." Id. at 775 (internal quotation marks, alteration, and citation omitted); see also Samantar v. Yousuf, 560 U.S. 305, 322 n.17 (2010) (noting that official acts immunity is not available to "an official who acts beyond the scope of his authority"). The Fourth Circuit then held that a foreign official exceeds the scope of his authority any time he engages in an act that violates jus cogens norms. See Samantar, 699 F.3d at 777 ("We conclude that, under international and domestic law, officials from other countries are not entitled to foreign official immunity for jus cogens violations, even if the acts were performed in the defendant's official capacity."). Because plaintiff alleges that defendant did exactly that, defendant's acts could not have been sanctioned by a foreign sovereign notwithstanding his position in the Somali National Army. Accordingly, just as in Samantar, defendant is not entitled to official acts immunity.

Defendant resists this conclusion by asking the Court to disregard the Fourth Circuit's decision, which obviously it cannot do. Defendant also seems to suggest that Somalia, as a sovereign state, ratified his acts at some point after they were committed. Even if defendant had some persuasive evidence of ratification, prohibitions against extrajudicial killing and torture are foundational international norms, meaning that no

18

state — Somalia included — may condone such acts.  Defendant's
arguments, weak as they are, simply confirm that the common law
affords him no immunity in light of plaintiff's allegations.

### d. Statute of Limitations

Finally, defendant argues that the statute of limitations
applicable to plaintiff's claims has run and that it is not
subject to equitable tolling.  Def.'s Br., at 17-23.  Under the
TVPA, a plaintiff has ten years from the date a cause of action
arises to bring suit for extrajudicial killing or torture.  28
U.S.C. § 1350 note ("No action shall be maintained under this
section unless it is commenced within 10 years after the cause
of action arose.").  The alleged attempted extrajudicial killing
and torture giving rise to plaintiff's claims occurred between
December 1987 and March 1988.  Am. Compl. ¶¶ 17-26.  Plaintiff
did not file suit until November 10, 2004, well more than ten
years after his cause of action arose.  Accordingly, the
dispositive question is whether the doctrine of equitable
tolling permits plaintiff's claims to go forward notwithstanding
the delay.

This Court answered the same question in the affirmative in
Yousuf v. Samantar, No. 1:04cv1360, 2012 WL 3730617, at *4-*6
(E.D. Va. Aug. 28, 2012).  To begin, statutory limitations
periods "are customarily subject to equitable tolling" in civil

19

suits between private litigants.  Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95 (1990) (internal quotation marks and citation omitted).  Whether equitable tolling is appropriate in any particular case depends on a finding of extraordinary circumstances that are both beyond the plaintiff's control and unavoidable even with diligence.  See id. at 95-96.  Federal courts have applied this usual rule to the TVPA's limitations period, see, e.g., Jean v. Dorelien, 431 F.3d 776, 779 (11th Cir. 2005); Papa v. United States, 281 F.3d 1004, 1012-13 (9th Cir. 2002), as did this Court, see Samantar, 2012 WL 3730617, at *4-*6.  Tolling the TVPA's limitations period is consistent with the Act's underlying policy: absent a remedy in courts of the United States, some of the most egregious cases of human rights violations might go unheard because the regimes responsible often possess the most inadequate legal mechanisms for providing redress.  See Arce v. Garcia, 434 F.3d 1254, 1261-62 (11th Cir. 2006).  Allowing tolling is also consistent with the Act's legislative history:

> [The TVPA] provides for a 10-year statute of limitations, but explicitly calls for consideration of all equitable tolling principles in calculating this period with a view toward giving justice to plaintiff's rights.  Illustrative, but not exhaustive, of the types of tolling principles which may be applicable include the following.  The statute of limitations should be tolled during the time the defendant was absent from the United States or from any jurisdiction in which the same or similar action

> arising from the same facts may be maintained by the
> plaintiff, provided that the remedy in that
> jurisdiction is adequate and available.  Excluded also
> from calculation of the statute of limitations would
> be the period when a defendant has immunity from suit.
> The statute of limitations should also be tolled for
> the period of time in which the plaintiff is
> imprisoned or otherwise incapacitated.  It should also
> be tolled where the defendant has concealed his or her
> whereabouts or the plaintiff has been unable to
> discover the identity of the offender.

S. Rep. No. 102-249, at 10-11 (footnote omitted).  Taken

together, general principles of equitable tolling and Congress's

explicit guidance on the matter provide multiple bases for

tolling the limitations period under the TVPA.

The same considerations that justified equitable tolling in

Samantar are present here.  First, based on plaintiff's

pleadings, the limitations period should be tolled during the

periods in which extraordinary circumstances — namely, sectarian

violence and political upheaval in Somalia — prevented plaintiff

from filing his claims.  See Irwin, 498 U.S. at 95.  There is a

consensus among the federal courts that civil war and a

repressive authoritarian regime constitute "extraordinary

circumstances" for purposes of tolling the TVPA's limitations

period.  See Jean, 431 F.3d at 780-81 (collecting cases).

Plaintiff has alleged that Barre's regime targeted members of

his clan for human rights abuses throughout the 1980s.  See Am.

Compl. ¶ 36.  Plaintiff has further alleged that the civil war

following the overthrow of Barre's regime in 1991 pushed Somalia into a state of "increasing chaos," resulting in "the killing, displacement, and mass starvation of tens of thousands of Somali citizens." Id. ¶ 37. Conditions began to improve slightly in 1997, when plaintiff's regional government (Somaliland) achieved semi-autonomous status and was able to "exercise a modicum of authority over its territory." Id. ¶ 40. Plaintiff has therefore pleaded adequate facts to show that it was impossible for him to file suit until at least 1997, when the extraordinary circumstances finally abated such that he could pursue his cause of action without fear in the United States or elsewhere. Because plaintiff did file by 2004, his claims are timely on this basis alone.

The limitations period should also be tolled during the periods in which defendant did not reside in the United States and therefore personal jurisdiction could not be obtained. See S. Rep. No. 102-249, at 7 (stating that "only defendants over which a court in the United States has personal jurisdiction may be sued"). Plaintiff has alleged that he filed suit within ten years of defendant's continuous presence in the United States following the overthrow of Barre's regime in Somalia. At that time, defendant was living in Canada. See Am. Compl. ¶ 7. In 1992, Canada deported defendant to the United States for gross

22

human rights abuses in Somalia.  Id. ¶ 8.  In 1994, the United

States similarly threatened defendant with deportation, and he

voluntarily departed for Somalia in July 1994.  Id. Defendant

nonetheless returned to the United States in December 1996 and

has been living here ever since as a lawful resident alien.  See

id.  Accepting these allegations as true, the limitations period

had not yet expired when plaintiff first filed suit on November

10, 2004, because defendant had been present in the United

States and subject to the reach of its courts for slightly less

than ten years.

Defendant responds that the limitations period continued to

run while he lived in Canada, which has a similarly fair legal

system providing an alternative forum for plaintiff's claims,

meaning this suit was filed at least a year too late.  See S.

Rep. No. 102-249, at 10-11 (noting that the "statute of

limitations should be tolled during the time the defendant was

absent from the United States or from any jurisdiction in which

the same or similar action arising from the same facts may be

maintained by the plaintiff").  The parties have submitted

competing reports by Canadian lawyers regarding the availability

of an adequate remedy there.  Plaintiff's expert plausibly

asserts that Canada's legal system does not afford an adequate

remedy.  On this record, defendant's motion will be denied,

although the factual dispute as to whether plaintiff could have brought his claims in Canada is appropriate for adjudication at trial.

In sum, plaintiff has alleged sufficient facts to avoid dismissal of his TVPA claims at this stage on statute-of-limitations grounds.

### 2. Adequacy of the Pleadings

The TVPA authorizes a cause of action against "[a]n individual" for acts of extrajudicial killing and torture committed under authority or color of law of any foreign nation. 28 U.S.C. § 1350 note.  The Act defines "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  Id.  The Act defines "torture" as "any act, directed against any individual in the offender's custody or physical control, by which severe pain or suffering . . . , whether physical or mental, is intentionally inflicted on that individual" for a number of different purposes.  Id.  In addition, the Act imposes an exhaustion requirement, which bars adjudication "if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."  Id.  Accordingly, to state a claim

24

under the TVPA, plaintiff must adequately allege (1) that
defendant possessed power by dint of his position in the Somali
National Army; (2) that the offending acts (i.e., attempted
extrajudicial killing and torture) derived from an exercise of
that power; and (3) that plaintiff exhausted all available
remedies in Somalia.

The allegations in the Amended Complaint contain all three
necessary ingredients.  Plaintiff has alleged that defendant
"served as Commander of the Fifth Battalion of the Somali
National Army" from 1984 to 1989, which covers the relevant
period, Am. Compl. ¶ 6; that defendant committed the offending
acts and directed other soldiers to commit the offending acts in
that capacity, id. ¶¶ 22-26; and that there has been an absolute
absence of remedies in Somalia since his claims arose, id.
¶¶ 41-42.  Similarly, plaintiff has alleged both offending acts
with requisite specificity, describing in graphic detail the
nature of the torture he endured and defendant's "deliberated"
attempt to kill him without process.  See id. ¶¶ 18-27, 45.
Defendant responds that the offending acts are beyond the reach
of the TVPA because they were committed before the TVPA was
enacted in 1991.  This line of argument has been considered and
rejected by several courts on the grounds that extrajudicial
killing and torture have clearly contravened established

international law for decades.  See, e.g., Cabello v. Fernandez-
Larios, 402 F.3d 1148 (11th Cir. 2005) (upholding jury verdict
in favor of a plaintiff who brought ATS and TVPA claims based on
offending acts that occurred in 1973).  Defendant has provided
no compelling reason to create a new rule here.

In addition to direct liability, plaintiff seeks relief
against defendant under three theories of secondary liability:
command responsibility, aiding and abetting liability, and joint
criminal enterprise.  The Supreme Court has recently affirmed
that "the TVPA contemplates liability against officers who do
not personally execute the torture or extrajudicial killing."
Mohamad v. Palestinian Auth., 132 S. Ct. 1702, 1709 (2012)
(citation omitted).  Even before Mohamad, "virtually every court
to address the issue" has "recogniz[ed] secondary liability for
violations of international law since the founding of the
Republic."  Aziz v. Alcolac, Inc., 658 F.3d 388, 396 (4th Cir.
2011) (internal quotation marks and alterations omitted); accord
Doe VIII v. Exxon Mobil Corp., 654 F.3d 11, 19 (D.C. Cir. 2011);
Khulumani v. Barclay Nat'l Bank, 504 F.3d 254, 260 (2d Cir.
2007) (per curiam).  Here, plaintiff's allegations are
sufficient to support each theory of secondary liability.
Plaintiff has alleged facts showing defendant not only knew that
members of his battalion were torturing plaintiff, but that

26

defendant personally participated in plaintiff's torture and further attempted to kill him by shooting him five times.  <u>See</u> Am. Compl. ¶¶ 28, 32, 34.  Such allegations leave little question whether the act and state-of-mind requirements for imposing secondary liability are met.  <u>See</u> <u>Samantar</u>, 2012 WL 3730617, at *11-*12 (articulating the relevant standards).

### III.   CONCLUSION

For these reasons, defendant's Renewed Motion to Dismiss will be granted as to all claims brought under the Alien Tort Statute and denied as to the claims brought under the Torture Victim Protection Act by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 29th day of July, 2014.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

27